[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1069 
Alyce Thomas, mother of 17-year-old Steve Thomas, was held in direct civil contempt by the juvenile court for her failure to disclose the whereabouts of her juvenile son. After she was incarcerated, Mrs. Thomas filed a petition for writ of habeas corpus in the circuit court. The circuit court denied the writ. On appeal, the Court of Criminal Appeals reversed. We granted certiorari to consider the question whether the juvenile court had jurisdiction to hold a parent in contempt of court for failure of the parent to disclose the whereabouts of her juvenile child.
Although the facts are well recited in the Court of Criminal Appeals opinion, Thomas v. State, 550 So.2d 1057 (Ala.Cr.App. 1989), we will recite them here to afford a better grasp of the issues. On May 12, 1988, a firebomb was thrown into an apartment in Gadsden, Alabama, resulting in the death of a 14-month-old infant. The three suspects in the firebombing were Mrs. Thomas's adult son, Bobo Guice; her 17-year-old grandson, Ollis Madden; and her 17-year-old son, Steve Thomas.
On May 13, 1988, the police obtained juvenile pick-up orders for Mrs. Thomas's grandson and her son Steve. Steve initially eluded the police, but was later brought to the police department by Mrs. Thomas and her husband.
On May 14, 1988, Steve gave a statement to the police and was arrested. Steve was later released into his mother's custody, pursuant ___ to ___ Ala. Code ___ 1975, § 12-15-58(a)(2), without being charged. Police officials informed Mrs. Thomas that Steve was being released into her custody, that charges would probably be forthcoming, and that she should bring him back at the appropriate time.
During the next several days, the police advised Mrs. Thomas that they needed to talk with Steve. Mrs. Thomas repeatedly told police officials that Steve was not at home but that she would bring him to the police station. On May 23, 1988, a juvenile pick-up order was issued for Steve because Mrs. Thomas had not brought Steve in for further questioning. When the police officials went to Mrs. Thomas's home with the pick-up order, she told the police that Steve had left on the night he was released into her custody.
On May 24, 1988, the authorities advised the juvenile court of Mrs. Thomas's actions. The juvenile court issued a pick-up order for Alyce Thomas, to place her in jail for "hiding and concealing a fugitive from justice." Mrs. Thomas was arrested and brought before the juvenile court for a "hearing on the whereabouts of Steve Thomas."
Mrs. Thomas repeatedly denied knowing where Steve was. The juvenile court refused to believe her, and advised her that *Page 1070 
she was in contempt of court. The court gave Mrs. Thomas 72 hours, until 5:00 p.m. on May 27, 1988, to produce Steve. The juvenile court informed Mrs. Thomas that if she did not comply with the court's order to divulge Steve's whereabouts, she would be placed in jail until she did comply.
Mrs. Thomas appeared before the juvenile court on May 27, 1988, and advised the court that she did not know Steve's whereabouts. The juvenile court placed Mrs. Thomas in jail for contempt of court for her refusal to comply with the court's order.
On June 1, 1988, Mrs. Thomas filed a petition for writ of habeas corpus in the circuit court. After a hearing, the circuit court determined that the juvenile court had jurisdiction over Mrs. Thomas and denied the writ. On June 2, 1988, after Mrs. Thomas was found in contempt, petitions charging Steve Thomas with murder and arson were sworn out.
Mrs. Thomas appealed the circuit court's order denying her petition for writ of habeas corpus. The Court of Criminal Appeals reversed the judgment of the circuit court and ordered the immediate release of Mrs. Thomas. Mrs. Thomas was released on August 18, 1988, almost three months after she had been incarcerated for contempt by the juvenile court.
 I. Jurisdiction of the Juvenile Court.
The contempt power of the courts has been characterized as essential to the courts' very existence. Ex parte Robinson, 86 U.S. (19 Wall.) 505, 511, 22 L.Ed. 205 (1873). Without contempt powers, courts could neither maintain their dignity, transact their business, nor accomplish the purpose of their existence.
Ala. Code 1975, at §§ 12-1-8 through -11, sets forth the general contempt powers of courts in Alabama. Section 12-15-12(a) provides for the contempt power of the juvenile courts:
 "Subject to the laws relating to the procedures therefor and the limitations thereon, the court may punish a person for contempt of court for disobeying an order of the court or for obstructing or interfering with the proceedings of the court or the enforcement of its orders." (Emphasis added.)
See also Model Juvenile Court Act (U.L.A.) § 58.
In order to hold a person in contempt, a court must have jurisdiction of the person and of the subject matter. Ex partePearce, 111 Ala. 99, 20 So. 343, 344 (1896); 17 C.J.S. Contempt
§ 64 (1964). However, even if a court has jurisdiction of the person and of the crime, an accusation made in the manner prescribed by law is a prerequisite to the court's power to exercise its jurisdiction. City of Dothan v. Holloway,501 So.2d 1136, 1146 (Ala. 1986) (Beatty, J., dissenting).
The jurisdiction of the juvenile court is set forth in Ala. Code 1975, §§ 12-15-30 through -36. More particularly, § 12-15-30(a) states:
 "(a) The juvenile court shall exercise exclusive original jurisdiction of the following proceedings, which are governed by this chapter:
 "(1) Proceedings in which a child is alleged to be delinquent, dependent or in need of supervision;
and
 "(2) Proceedings involving traffic offenses which have been transferred to the juvenile court pursuant to subsection (b) of section 12-15-33.
 "(b) The court shall also exercise exclusive original jurisdiction of the following proceedings, which shall be governed by the laws relating thereto:
 "(1) Proceedings to determine custody or to appoint a legal custodian or guardian of the person of a child when the child is otherwise before the court. This provision, however, shall not be construed to deprive other courts of the right to determine the custody or guardianship of the person of children when such custody or guardianship is incidental to the determination of cases pending in those courts. Such courts, however, may certify said questions to the juvenile court for hearing *Page 1071 
and determination or recommendation;
 "(2) Removal of disabilities of nonage, including judicial consent to marriage, employment or enlistment when such consent is required by law;
 "(3) Proceedings under the Interstate Compact on Juveniles;
 "(4) Proceedings for the commitment of a mentally ill or mentally retarded child;
 "(5) Proceedings for the adoption of a child when such proceedings have been removed from probate court on motion of any party to the proceedings; and
"(6) Termination of parental rights.
 "(c) The court shall have original jurisdiction in proceedings:
"(1) Concerning any child:
 "a. Who is in a situation subjecting him to physical, mental or emotional abuse or is in clear and present danger of suffering lasting or permanent damage; or
 "b. Who requires emergency medical treatment in order to preserve his life, prevent permanent physical impairment or deformity or alleviate prolonged agonizing pain;
 "(2) Where it is alleged that a child's rights are improperly denied or infringed in proceedings resulting in suspension, expulsion or exclusion from a public school." (Emphasis added.)
Cases before the juvenile court are initiated by the filing of a petition with the intake officer. Ala. Code 1975, § 12-15-50. Rule 12 of the Alabama Rules of Juvenile Procedure delineates the steps for initiating a juvenile court case:
 "(A) Any person or agency having knowledge of the facts may make a complaint to the intake office alleging facts sufficient to establish the jurisdiction of the court and the delinquency, dependency or need of supervision of the child. A complaint is made when it is filed with the intake office, which shall immediately note thereon the date and time of filing.
 "(B) Whenever the court is in receipt of a complaint the intake office shall conduct a preliminary inquiry to determine whether the child is within the jurisdiction of the court and whether the best interests of the child or of the public require that a petition be filed.
 "(C) If it appears from the preliminary inquiry that the child is within the jurisdiction of the court and judicial action appears necessary, the intake officer shall either:
 "(1) make informal adjustment pursuant to Rule 15; or
 "(2) file a petition where judicial action appears necessary.
 "(D) If the intake office recommends the filing of a petition, such action shall be final. The filing of a petition shall occur within fourteen (14) days of receipt of the complaint, except as provided in Rule 15 or when a child has been detained.
 "(E) In cases of the violation of a law or ordinance relating to the operation of a motor vehicle by a child under the age of sixteen (16), or in cases transferred to a juvenile court by any court exercising jurisdiction over traffic offenses, the issuance of a traffic citation or summons shall be sufficient to invoke the jurisdiction of the court." (Emphasis added.)
Section 12-15-52(c) states that the petition shall set forth with specificity the following:
 "(1) The facts which bring the child within the jurisdiction of the court, the facts constituting the dependency, delinquency or need of supervision and that the child is in need of supervision, treatment, rehabilitation, care or the protection of the state, as the case may be;
 "(2) The name, age and residence address, if any, of the child on whose behalf the petition is brought;
 "(3) The names and residence addresses, if known to the petitioner, of the parents, guardian or custodian of the child. If no parent, guardian or custodian resides or can be found within the state or if their respective places of residence are unknown, the name of any known adult relative residing within the district or, if there be none, the known *Page 1072 
adult relative residing nearest to the location of the court; and
 "(4) The place of the child's detention and the time he was taken into custody, if the child in custody is delinquent or in need of supervision."
We agree with the Court of Criminal Appeals that the juvenile court did not have jurisdiction over Mrs. Thomas to hold her in contempt of court. The jurisdiction of the juvenile court would attach only after a petition had been properly filed with the intake officer,[1] and the court had conducted a preliminary inquiry to determine whether the child was within the jurisdiction of the court. "The primary purpose of juvenile court intake is to screen out cases that are not within the court's jurisdiction." P. Piersma, J. Ganorsis, A. Volenik, H. Swanger, P. Connell, Tactics in Juvenile Cases, 213 (3d ed. 1977).
In the present case, the petitions charging Steve Thomas with murder and arson were not "sworn out" until after Mrs. Thomas had been found in contempt by the juvenile court and incarcerated. Because an action had not been properly commenced against Mrs. Thomas's juvenile son, the juvenile court did not have the jurisdiction to hold Mrs. Thomas in contempt. If theproper petitions charging Steve had been filed with the intakeofficer and the preliminary inquiry conducted to determine ifSteve was within the jurisdiction of the juvenile court, thecourt could have properly exercised its powers and held Mrs.Thomas in contempt.
 II.
Although it is not necessary to the resolution of this case, because we have already held that the juvenile court lacked jurisdiction over Mrs. Thomas, we nonetheless address the distinction between civil and criminal contempt.
 Civil or Criminal Contempt.
Contempts are characterized as either civil or criminal. Civil contempt seeks to compel or coerce compliance with orders of the court, while a criminal contempt is one in which the purpose of the proceeding is to impose punishment for disobedience of orders of the court. Charles Manufacturing Co.v. United Furniture Workers, 361 So.2d 1033, 1035 (Ala. 1978);Ex parte Abercrombie, 277 Ala. 479, 172 So.2d 43 (1965);Carroll v. State, 350 So.2d 723 (Ala.Crim.App. 1977).
The sanction for civil contempt continues indefinitely until the contemnor performs as ordered. A critical distinction is that the sanction for criminal contempt is limited in Alabama district and circuit courts to a maximum fine of $100 and imprisonment not to exceed five days. Ala. Code 1975, §12-11-30, § 12-12-6, and § 12-15-12; Graham v. State,427 So.2d 998 (Ala.Civ.App. 1983).
 Direct or Indirect Contempt.
Contempt is also characterized as direct or indirect. A civil or a criminal contempt may be either direct or indirect. Direct contempts are those committed in the judge's presence, where all of the essential elements of the contempt are under the eye of the court, and are actually observed by the court. In a direct contempt case, the judge can summarily and instantaneously find the person to be in contempt.
If some of the essential elements of contempt are not personally observed by the judge, the contempt is indirect.Tetter v. State, 358 So.2d 1046 (Ala. 1978). An indirect contempt is committed outside the presence of the court and is characterized by the act of disobeying the court's orders.Brooks v. Brooks, 480 So.2d 1233 (Ala.Civ.App. 1985); Nicholsv. Nichols, 46 Ala. App. 67, 238 So.2d 186, cert. denied,286 Ala. 156, 238 So.2d 190 (1970).
The elements of "due process" to be afforded an individual charged with indirect contempt are different from the elements of due process to be afforded one charged with a direct contempt. Cooke v. *Page 1073 United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925);Charles Manufacturing Co., supra. Where an individual is charged with indirect or constructive contempt, due process requires that he be given notice of the charges and a reasonable opportunity to meet them, the right to call witnesses and confront his accuser, and the right to give testimony relevant either to complete exculpation or to extenuation of the offense and evidence in mitigation of the penalty to be imposed. In re Oliver, 333 U.S. 257,68 S.Ct. 499, 92 L.Ed. 682 (1948); International Brotherhood ofElectrical Workers, Local 136 v. Davis Constructors Engineers, Inc., 334 So.2d 892 (Ala. 1976).
The line between civil and criminal contempt can sometimes become blurred, as in this case. Conceivably, if the juvenile court had jurisdiction, then Mrs. Thomas's actions could have constituted indirect criminal contempt, direct criminal contempt, indirect civil contempt, and direct civil contempt. Prior to May 24, 1988, the date she appeared before the juvenile court, Mrs. Thomas was guilty, if at all, of indirect civil contempt and indirect criminal contempt. Any act by Mrs. Thomas occurred outside the presence of the court. On May 24, 1988, the day she appeared before the juvenile court, her actions could have constituted direct civil contempt, direct criminal contempt, indirect civil contempt, and indirect criminal contempt. Because Mrs. Thomas disobeyed the order of the court by not producing her son, Mrs. Thomas would have been guilty of criminal contempt.
Confusion arises in attempts to classify civil and criminal contempts, because the elements often overlap. In appropriate circumstances, however, a party's actions can support a finding of both civil and criminal contempt. Klingler v. White,465 So.2d 405, 408 (Ala.Civ.App. 1984); Wilson v. Freeman,402 So.2d 1004 (Ala.Civ.App. 1981).
Because incarceration on a finding of civil contempt is a sanction coercive in nature and is designed to compel compliance with the court's orders, when the punishment can no longer have any coercive effect it becomes punitive and may no longer be imposed. Brooks, supra. Because it is impossible to coerce that which is beyond a person's power to perform, once the confinement ceases to have any coercive impact, continued imprisonment for civil contempt constitutes a violation of due process. Brooks, supra; In re Grand Jury Investigation,600 F.2d 420, 424 (3d Cir. 1979); Lambert v. State of Montana,545 F.2d 87 (9th Cir. 1976).
In the present case, the juvenile court held Mrs. Thomas in direct civil contempt. Mrs. Thomas repeatedly denied knowing her son's whereabouts. Because Mrs. Thomas was held in civil contempt, she conceivably could have remained incarcerated indefinitely. But what if she actually did not know where her son was located? In cases such as this, after the contemnor has been incarcerated for a substantial length of time, the trial judge should bring the contemnor before him for another due process hearing in which he can reevaluate the factual basis of his first adjudication. If he is satisfied that his determination was correct, he should again incarcerate her. If he is of the opinion that she is telling the truth, of course, he should release her. This issue is moot, however, because she was released on August 18, 1988.
For the foregoing reasons, the judgment of the Court of Criminal Appeals is due to be affirmed.
AFFIRMED.
JONES, ALMON, SHORES, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
MADDOX, J., dissents.
[1] One of the intake office's duties is to make primary contact with law enforcement agencies coming under the jurisdiction of the court. Ala. Code 1975, § 12-15-1(13).